IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 1, 2018

## IN RE GABRIEL C.[1]

**Appeal from the Juvenile Court for Hamilton County**
**No. 276895   Robert D. Philyaw, Judge**

_____

## No. E2017-02398-COA-R3-PT

_____

A mother appeals the termination of her parental rights to her son, who tested positive for illegal drugs at birth.  In due course, the child was placed in the custody of the Department of Children's Services and adjudicated dependent and neglected; Mother was later sentenced to a ten-year prison term.  The Department thereafter filed a petition to terminate Mother's parental rights and, following a trial, Mother's rights were terminated on the grounds that Mother had been found guilty of severe child abuse of the child's half-sister in another proceeding and abandonment by incarcerated parent and upon the finding that termination was in the child's best interest.  Mother appeals; upon a thorough review of the record, we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J., joined.

Emily Brenyas, Chattanooga, Tennessee, for the appellant, Valerie H.

Herbert H. Slatery, Attorney General and Reporter; and Erin A. Shackelford, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

In this appeal, Valerie H. ("Mother") appeals the termination of her parental rights to her son, Gabriel, born in March 2016.  The Tennessee Department of Children's

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

Services ("the Department" or "DCS") initiated the proceeding on April 10, 2017, in the Hamilton County Juvenile Court, asserting the following grounds for termination: severe child abuse; that mother had been ordered to serve a jail sentence of ten years; abandonment by incarcerated parent; and persistence of conditions. The petition also alleged that termination was in Gabriel's best interest. The facts pertinent to the appeal, which are not disputed, are set forth in the order filed November 8, 2017, terminating Mother's rights:

> 4) On March 18, 2016, the Department received a referral alleging drug exposed child. The child's meconium was positive for marijuana. Child Protective Services (CPS) attempted to work with the family to determine if any services would be necessary, but [Mother] did not cooperate in the investigation and denied drug use. [Mother] reported that she had been attending the methadone clinic and had been clean for several months.
>
> 5) CPS requested that [Mother] submit to another drug screen the following week through a hair follicle test. Health Connect contacted the parents several times and made several different appointments for them to appear and provide a sample. Neither parent appeared at any of the appointments. They avoided further face-to-face contact with CPS.
>
> 6) CPS obtained records from the methadone clinic dating back to August 2015. Several drug screens consented to by [Mother] indicated positive results for amphetamines.
>
> 7) On May 2, 2016, a Child and Family Team Meeting was held at the DCS offices. [Mother] failed to appear for the meeting.
>
> 8) At the time of the removal, [Mother] had active criminal warrants for her arrest. [Mother] testified that she pled guilty to attempting to initiate the manufacture of methamphetamine and received probation for six (6) years in Hamilton County on May 23, 2013. In Bradley County, she was convicted on June 10, 2013, for initiation of methamphetamine manufacturing process, two (2) counts of child abuse, and one (1) count of identity theft. She received a cumulative ten (10) year sentence (eight (8) years on the meth charge and two (2) years on the child abuse charge), which was suspended and she was placed on probation. However, on April 3, 2017, [Mother] was found to have violated the terms and conditions of her probation for the following: positive drug screen (amphetamine, methamphetamine, and marijuana); failure to provide proof of employment or job search; failure to pay on fines, court costs, and fees; and for threatening behavior to an unborn child, as the drug screen was done while she was pregnant with the subject child. Consequently, she was ordered to serve the remainder of her ten (10) year sentence.

9) On May 3, 2016, the Department was granted temporary legal custody of the child due to drug exposure and the parents' inability to provide a safe and stable home environment.

10) On May 9, 2016, FSW Charming Phillips contacted [Mother] by telephone. FSW Phillips informed [Mother] of the Child and Family Team Meeting (CFTM) on May 19, 2016.

11) Following the child's placement into foster care, the Department developed a permanency plan on May 19, 2016, to assist [Mother] with reunification. [Mother] failed to appear at the CFTM despite being notified multiple times by telephone and a meeting notification letter. FSW Phillips testified that she made numerous attempts to contact [Mother], but eventually was only able to locate her after she was arrested and incarcerated. She testified that she has visited [Mother] numerous times while she has been in jail.

12) On June 23, 2016, [Mother] was arrested in Hamilton County, Tennessee on two (2) charges of violation of probation, stemming from attempted initiation of the manufacture of methamphetamine and assault. At that time, Bradley County, Tennessee also had a hold on [Mother], stemming from additional probation violations related to her convictions for initiation of methamphetamine manufacturing process, child abuse, identity theft, and attempt to initiate methamphetamine manufacturing process.

13) FSW Phillips testified that she met with [Mother] on June 24, 2016 at the Hamilton County Jail and went over her responsibilities under the permanency plan. [Mother] signed a Statement of Responsibilities and was provided with a copy. [Mother] also signed a resource list and was provided with a copy. [Mother] signed and received a copy of the Criteria for Termination of Parental Rights and was given an explanation of its contents. [Mother], through her testimony, acknowledged that this meeting took place, and that the paperwork was reviewed with her while she was incarcerated.

14) During their meeting, [Mother] informed FSW Phillips that she was scheduled to be transferred to the Silverdale Detention Facility in a few days and that her next court date on her charges in Hamilton County was scheduled for July 2016. FSW Phillips provided the mother with an update and a picture of the child.

15) On July 11, 2016, the Hamilton County Juvenile Court ordered the mother to submit to a hair follicle drug screen at the Department's request.

16) On July 22, 2016, a representative from Health Connect America went to the Silverdale Detention Facility in Chattanooga, Tennessee to retrieve a hair sample from [Mother] to complete the hair follicle drug

3

screen. However, [Mother] refused to provide a hair sample. [Mother] testified it was because she did not want her hair cut.

17) [Mother] subsequently submitted to a hair follicle drug screen on August 3, 2016, during a Motion for Show Cause filed by the Department for her refusal to comply with the Court's prior order. She tested positive for methamphetamine and amphetamine.

18) On August 26, 2016, FSW Phillips visited [Mother] at the Silverdale Detention Facility in Chattanooga.

19) On August 29, 2016, the child was adjudicated dependent and neglected by the Hamilton County Juvenile Court.

20) The permanency plan developed by the Department on May 19, 2016, was ratified by the Court and found to be in the best interest of the child and that the responsibilities were reasonably related to the reasons that necessitated foster care. Under the permanency plan, [Mother] was required to complete the following responsibilities:

a) Complete a hair follicle test before being allowed visitation with the child and have an alcohol and drug assessment and follow all recommendations;

b) Have a mental health intake to address the trauma of previous involvement with the Department and follow all recommendations;

c) Resolve all legal issues;

d) Pay child support as Ordered by the Court;

e) Provide proof of legal and verifiable income;

f) Obtain and maintain stable housing for six (6) months and provide verification;

g) Sign all necessary releases, stay in contact with DCS, visit the child regularly, notify DCS of any changes, and attend medical appointment as able.

21) [Mother] testified that she has completed everything that she can on her plan while incarcerated. She testified that she completed alcohol and drug classes and "emotional" classes while incarcerated, but that she could finish the steps of her permanency plan upon her release and have a job. She stated that since being incarcerated she is resolving her legal issues. FSW Phillips opined that she did not believe the alcohol and drug classes taken while [Mother] was incarcerated would be sufficient to address [Mother's] long-term drug use, but does acknowledge that [Mother] has done everything that she could do while incarcerated. The Court finds no evidence of any drug use for the last (14) fourteen months during which [Mother] has been incarcerated.

22) On November 15, 2016, a CFTM was held and a new permanency plan was developed for the family. FSW Phillips subsequently met with [Mother] on December 1, 2016, at the Silverdale Detention

4

Facility, and went over her responsibilities under the new permanency plan. [Mother] signed a Statement of Responsibilities and was provided with a copy. [Mother] signed a resource list and was provided with a copy. [Mother] also received a copy of the Criteria for Termination of Parental Rights and was given an explanation of its contents. However, she refused to sign the Criteria for Termination of Parental Right form.

23) On December 22, 2016, FSW Phillips visited [Mother] at the Silverdale Detention Facility.

24) On December 30, 2016, [Mother] was released from the Silverdale Detention Facility and transferred to Bradley County Jail on violation of probation charges.

25) On April 3, 2017, the Bradley County Criminal Court found that [Mother] had violated the terms and conditions of probation for prior charges of initiation of methamphetamine manufacturing process, child abuse, identity theft, and attempt to initiate methamphetamine manufacturing process. [Mother] was found to have violated the terms of probation by providing a positive drug screen for methamphetamine and marijuana; failure to provide proof of employment or job search; failure to pay fines, costs, and fees; and, for threatening behavior toward her unborn child. [Mother] was ordered to serve the remainder of her ten (10) year cumulative prison sentence and currently remains incarcerated at this time. She also has additional sentences for another child abuse charge and an identity theft charge, which are running concurrently with her current sentence. [Mother] testified that she has been incarcerated since June 23, 2016 and was transferred to the Bradley County Jail on or about December 30, 2016. She acknowledges that she currently has a ten (10) year sentence, but believes her release date may be in 2019 and maintains she will be eligible for parole soon. [Mother] testified that she has only been out of incarceration for one (1) month since the child was placed into foster care.

A trial was held on August 31, 2017, in the Juvenile Court for Hamilton County, Tennessee. The trial court entered an order on November 8, terminating Mother's parental rights on the grounds of severe child abuse[2] and abandonment by incarcerated parent,[3,4] and on the finding that termination would be in the best interest of the child.[5] Mother appeals, raising the following issues for our review:

---

[2] Tennessee Code Annotated sections 36-1-113(g)(4) and 37-1-102(b)(22).

[3] *Id.* at sections 36-1-113(g)(1), -102(1)(A)(iv), -102(1)(C), and -102(1)(E).

[4] The court acknowledged that Mother was currently serving a cumulative ten-year sentence and facing an additional charge in its discussion of this ground of termination, but did not base the termination of her rights on abandonment by an incarcerated parent under section 36-1-113(g)(6).

I. Appellant's prior severe abuse adjudication was improperly relied upon since all evidence at trial was that Appellant did not receive required due process in those proceedings.

II. Appellant completed her permanency plan to the best of her abilities under the circumstances and did not willfully fail to comply with the plan.[6]

III. Appellant would submit that her work toward completing her permanency plan shows it is in the child's best interest to maintain the parent child relationship.

Mindful of the instruction set forth by our Supreme Court that, "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal," we will review the evidence as to each ground upon which the court based its order terminating Mother's rights. *In Re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) (footnote omitted).

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard

---

[5] The court held that DCS had not proven persistence of conditions under section 36-1-113(g)(3) by clear and convincing evidence.

[6] The Department did not seek to termination Mother's rights on the grounds of failure to comply with the permanency plan under section 36-1-113(g)(2), and the court did not base the termination of her rights on this ground. We will, consequently, consider her argument as to this issue in conjunction with her argument as to Issue III.

of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## III. DISCUSSION

### A. SEVERE CHILD ABUSE

The trial court based the ground for termination of severe child abuse on an order entered in a dependent and neglect proceeding in Sequatchie County Juvenile Court involving Gabriel's half-sister, which held that the half-sister "was a victim of severe abuse at the hands of [Mother] because of her in utero exposure to methamphetamine."[7] As to the order, the trial court held that, while the court "does not know all the facts and circumstances regarding the underlying proceeding or the due process issues as to that proceeding, this matter is *res judicata*." Mother contends that the trial court "improperly relied upon [the Sequatchie County adjudication] since all evidence at trial was that [Mother] did not receive required due process in those proceedings."

The *res judicata* effect of a finding of severe child abuse in a dependent and neglect proceeding in a subsequent termination of parental rights action was discussed in *In re Heaven L.F.*:

> The doctrine of *res judicata* applies when "an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue

---

[7] The order was an adjudicatory hearing order entered on July 18, 2014; Gabriel's half-sister was born in March 2014.

as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." *Galbreath v. Harris,* 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990). This court previously applied the doctrine of *res judicata* to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding, when such a finding had been made in a previous dependency and neglect action. *See State v. Tate,* No. 01-A-01-9409-CV-00444, 1995 WL 138858, at *5 (Tenn. Ct. App. Mar. 31, 1995). Mother and the Department were parties in the dependency and neglect action and the issue of whether Mother committed severe child abuse was fully litigated in that action. Therefore, the issue of whether Mother committed severe child abuse is *res judicata* and the trial court properly found by clear and convincing evidence that Mother's parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(4).

*In re Heaven L.F.*, 311 S.W.3d 435, 439–40 (Tenn. Ct. App. 2010).

Mother states that the only evidence relative to this ground came from the order itself and her testimony relative to the proceeding. A certified copy of the order of the Sequatchie County Juvenile Court was introduced at trial without objection; when the exhibit was tendered, her counsel stated "I believe it's admissible. My client would like it noted that she was not represented by counsel in those proceedings." Mother's brief on appeal does not cite to any specific testimony to support her argument, stating only:

Mother testified to several violations of her due process rights in the Sequatchie County proceedings. She was incarcerated in the Sequatchie County Jail at the time of the hearing, but was not afforded the opportunity to participate in the hearing. She was not appointed counsel. Nor was she informed of her appellate rights. The Certificate of Service on the adjudicatory Order lists an address in Dunlap, TN which does not match the address of the Sequatchie County Jail.

Notwithstanding the fact that Mother has not cited to specific testimony in this regard, we have reviewed her entire testimony. The portions that address this ground are the following colloquies from her direct examination conducted by counsel for DCS and cross-examination by her counsel:

Q. Okay. Were you found to have committed severe child abuse against one of those children?
A. I guess on paperwork I have been. I never seen paperwork or anything. Was never in court for it. Never.
Q. Was that in Sequatchie County? Was that in Sequatchie County?
A. Yes.

Q. Okay. How did you become to be found to have committed child abuse, severe child abuse against that child?
A. I don't know. I was never there.
Q. Okay. You're saying you didn't participate in those proceedings?
A. I was in jail and they didn't transport me.
Q. Okay.
A. And I was in the same county as the jail.
Q. Okay. And you didn't appeal that --
A. Or I was in the same building at that time. And I what?
Q. You didn't appeal that finding, did you?
A. I was in jail. I was in jail. I didn't know I could. I didn't have a lawyer. I wasn't represented by nobody.

On cross-examination Mother testified:

Q. Okay. Now, in your case with [the child who was the subject of the dependent and neglect proceeding], did you ever hear from an attorney?
A. No.
Q. Were you ever advised of your rights to appeal by the court?
A. No.
Q. Not by the court and not by an attorney?
A. I never went to court over nothing.
Q. You were never present at any of the juvenile proceedings?
A. The only -- no. The only one I was in is whenever they assigned me an attorney that I had took and signed -- surrendered my rights to.
Q. Okay. But that was well after the severe abuse adjudication?
A. Yes.
Q. Okay.
A. That was after they had done filed for termination.

Mother's argument is not well-taken; the testimony and order do not raise a substantial question as to the integrity of the child abuse adjudication for *res judicata* purposes. Her testimony does not dispute either the finding of abuse or the evidentiary basis for the finding. The order recites that Mother was given notice of the proceeding. Through the course of her entire testimony, Mother recounts her history of involvement with drugs, her lifestyle, her six children, and numerous incarcerations; viewed in context, the testimony quoted above simply does not establish a basis upon which to hold that the child abuse adjudication is tainted by fraud or collusion, by constitutional infirmity, or in any other way not entitled to *res judicata* effect. The judgment is clear and convincing evidence supporting termination of Mother's rights on this ground.

9

**B.** ABANDONMENT BY INCARCERATED PARENT 36-1-113(g)(1) AND 36-1-102(1)(A)(iv), -102 (1)(C) AND -102(1)(E)

A parent's rights may be terminated on the ground of abandonment, as defined in Tennessee Code Annotated section 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). Section 36-1-102(1)(A)(iv) defines abandonment, in relevant part, as follows:

A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits wanton disregard for the welfare of the child. . . .

This court has stated that section 36-1-102(1)(A)(iv) "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Ultimately, "[a] parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.* Incarceration alone is not the only ground for abandonment under section 36-1-102(1)(A)(iv); an incarcerated or recently incarcerated parent can be found guilty of abandonment "if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *In re Audrey*, 182 S.W.3d at 866. Accordingly, a parent's incarceration "allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

The pre-incarceration conduct referred to in section 36-1-102(1)(A)(iv) is *not* limited to acts during the four-month period immediately preceding the incarceration. *In re Jeremiah T.*, No. E2008-02099-COA-R3-PT, 2009 WL 1162860, at *8 (Tenn. Ct. App. Apr. 30, 2009) (citing *In re Audrey S.*, 182 S.W.3d at 871). It is well established that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the child's welfare." *In re Audrey S.* 182 S.W.3d at 867-68 (citing *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7-8 (Tenn. Ct. App. Jan. 11, 2005) (perm app. denied Tenn. Mar. 21, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004) (no Tenn. R. App. P. 11

application filed); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *In re C.W.W.*, 37 S.W.3d 467, 474-75 (Tenn. Ct. App. 2000)).

The trial court found that Mother has a long criminal history and was incarcerated for the four months preceding the filing of the petition for termination and that "Mother's conduct prior to incarceration exhibits a wanton disregard for the welfare of the child." Additionally, the court found that Mother was currently serving a ten-year sentence and had other charges pending; that Gabriel tested positive for illegal drugs at birth; and, that following his birth, Mother "continued to engage in criminal activities, including but not limited to violating the terms and conditions of her probation in Bradley County."

Mother does not contest these findings on appeal, and upon our review, the findings are supported by clear and convincing evidence, summarized in the court's findings of fact quoted above. Accordingly, we affirm the trial court's conclusion that the evidence clearly and convincingly established this ground for termination of Mother's parental rights.

## IV. BEST INTEREST

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of factors for the courts to follow in determining the child's best interest. Tenn. Code Ann. § 36-1-113(i).[8]

---

[8] The factors at Tennessee Code Annotated section 36-1-113(i) are:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

11

The list of factors "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

The trial court made findings of fact that correlate with factors (1), (3), (4), (5), and (7) of section 36-1-113(i). Mother does not take issue with the trial court's findings in this regard and, upon our review, the findings are supported by clear and convincing evidence.[9]

Mother contends that the efforts she has made to comply with the permanency plan militate in favor of a finding that termination of her rights is not in Gabriel's best interest. As we consider this issue, we are mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

---

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

[9] Examples of the findings include:

> [Mother] has failed to achieve sobriety and the stability necessary for her to parent the child. . . has been incarcerated throughout most of the child's custodial episode. . . has an extensive history of drug abuse and drug charges, rendering her consistently unable to care for the child in a safe and stable manner. . . has abused or neglected the subject child and his half-sibling, as both children were born exposed to illegal drugs. . . and has made no effort to discontinue her life of crime and association with criminals.

We do not take lightly that Mother has completed courses to address her longstanding drug and alcohol issues. The proof of those efforts, however, do not preponderate against the specific findings of the court and its holding, on the basis of those findings, that termination of Mother's rights was in Gabriel's best interest.

## V. CONCLUSION

For the foregoing reasons, the judgment of the trial court terminating Mother's parental rights is affirmed.

_____
RICHARD H. DINKINS, JUDGE