IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 10, 2020 Session

## JUDITH GALILEA ABNER v. STEVEN DALE ABNER

**Appeal from the Chancery Court for Anderson County**
**No. 17CH9034      M. Nichole Cantrell, Chancellor**

———————————————————

**No. E2019-01177-COA-R3-CV**

———————————————————

This appeal arises from a divorce action between Judith Galilea Abner ("Wife") and Steven Dale Abner ("Husband"). As part of the divorce, the Trial Court entered an order classifying certain property inherited by Husband during the divorce as his separate property after finding that this property had not been comingled or transmuted into marital property. Husband also was awarded as his separate property the value of a log cabin at the time of marriage. The parties had resided in the log cabin throughout the marriage and made substantial improvements to the log cabin during the marriage to which Wife had substantially contributed. The Trial Court, therefore, classified the appreciation of value of the log cabin as marital property, and Wife was awarded one-half of the increase in value of the property. The Trial Court classified as marital property an account in Wife's sole name, upon its finding that the money in the account had been comingled such that the money could no longer be traced back to the original deposit. Additionally, the Trial Court granted an award of attorney's fees to Husband for four of the five days of trial due to Wife changing her testimony and the "immense amount of time spent on these issues." Wife timely appealed to this Court. We affirm the Trial Court's findings concerning the classification of the parties' property. However, we reverse the Trial Court's award of attorney's fees to Husband.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Thomas M. Leveille, Knoxville, Tennessee, for the appellant, Judith Galilea Abner.

David L. Valone and Cecilia S. Petersen, Knoxville, Tennessee, for the appellee, Steven Dale Abner.

## OPINION

## Background

Wife and Husband met in 1995. At the time, Wife was a citizen of Mexico and was in Knoxville, Tennessee to visit her sister. While in Mexico, Wife owned and operated a convenience store. In 1997, Wife sold her business for $32,000 or $34,000 and moved to Tennessee to marry Husband. Wife later became a citizen of the United States. The proceeds from the sale of Wife's business were placed initially in a bank in Mexico in Wife's sole name.

Several years prior to the marriage, Husband's grandparents had conveyed him a parcel of land, on which he built a log cabin ("Residence"). Husband lived in the Residence alone for thirteen years before marrying Wife. Wife and Husband married in July 1997. The parties lived in the Residence for the entire duration of their marriage. Husband and Wife separated in November 2016. Wife filed a complaint for divorce in the Anderson County Chancery Court ("Trial Court") in June 2017. At the time of trial, Wife worked as a Sales Manager for BHS Corrugated, which makes and sells machinery in Latin American countries. During the marriage, Husband worked as a deputy with the Anderson County Sheriff's Department.

After the parties were married, they opened a joint bank account at ORNL Federal Credit Union. Both parties deposited their respective incomes into this account during the marriage. The parties spent money from this account to make significant improvements to the Residence, increasing the value of the property during the marriage by approximately $65,900. Wife testified that the parties had finished the basement of the Residence, added a screened-in porch on the back of the home, built a detached two-car garage, replaced the roof twice, put in new flooring, and made repairs to the Residence. The deed for the Residence remained in Husband's sole name. Wife presented copies of checks written from the parties' joint checking account to pay property taxes on the Residence for 2010, 2011, 2012, 2013, and 2014. Wife testified that she did not pay rent to live in the Residence and that they did not have a house payment during the marriage. The monthly utility payments and insurance premium payments on the Residence were paid from the parties' joint checking account.

In addition to the parties' joint bank account, Wife also opened a separate account at ORNL in 2005. Wife initially testified that she transferred the funds in March 2009 into a subaccount of the parties' joint bank account. Wife further testified that no other money was placed into or taken out of the account after the deposit. On a subsequent day of trial, Wife testified that she had been mistaken about which account the money had been deposited when it was transferred from Mexico. According to Wife, the money was actually transferred into the separate bank account in her sole name in March 2009. On

- 2 -

cross-examination, Wife acknowledged that she had testified in a deposition that the money was transferred from Mexico between 2002 and 2005. Following Wife's deposition, she filed as a late-filed exhibit to her deposition a bank statement from the parties' joint bank account in response to a question concerning the balance of the account at the time of the marriage. Wife testified that in 2011 and 2012, she withdrew the money from the account where it was located and deposited it into the Genworth (formerly Nuveen) account. Wife did not have the statements from when the account was with Nuveen, but presented the Genworth statements as an exhibit at trial.

The Trial Court found Wife's testimony to not be credible and ultimately found that in 2004, Wife placed the proceeds from the sale of her business in Mexico into the money market subaccount of the parties' joint bank account, relying on the bank statement Wife had submitted as a late-filed exhibit to her deposition. Following trial, the Trial Court found that after the deposit, additional money was placed in and taken out of that subaccount throughout the years.

Husband's grandmother passed away, which was followed by Husband's grandfather's decline in health and subsequent passing in 2011. Following litigation concerning the grandfather's will, Husband inherited the majority of his grandfather's estate, including the farm, a trailer park, and the "Stone House," where the grandparents had resided prior to their passing (collectively, "Inherited Property"). The litigation expenses for the will contest and conservatorship action amounted to approximately $80,000, which had been paid from the parties' joint bank account. According to Husband, he reimbursed the joint bank account for the litigation expenses from income generated from the Inherited Property. Following the will contest litigation, Husband wrote a check from the parties' joint checking account for his mother's portion of the inheritance in the will, which amounted to approximately $16,000.

Husband made some improvements and repairs to the Stone House, which he paid for from the parties' joint bank account. He subsequently began renting out the Stone House. The rent Husband received from the trailer park and from the Stone House was placed either in the parties' joint bank account, a bowl containing petty cash located in the kitchen of the home, his pocket, or an envelope he kept in his "cruiser" for property taxes. One deed covers the real property where the farm, trailer park, and the Stone House are located. Husband testified that he paid the property taxes for the real property from either the envelope in his cruiser or the parties' joint bank account. Wife testified that the property taxes were paid by check from their joint checking account. Concerning the Inherited Property, Wife presented copies of checks from the parties' joint bank account for the property taxes for 2011, 2012, 2013, 2014, 2015, and 2016. Husband testified that he paid the insurance payments for the Inherited Property from the joint checking account.

- 3 -

Shortly after receiving title to the Inherited Property, Husband sold timber from the property, totaling $83,529. This money was placed into the parties' joint bank account. Subsequently, Husband sold more timber for $60,075, which also was placed in the joint checking account. Individuals hired to do work on the farm or the trailer park were paid by check from the parties' joint checking account. Husband prepared a summary of expenses which related to the Inherited Property. Husband conceded that the expenses were paid from the parties' joint bank account. Husband's summary of expenses, his receipt book, and the income tax returns were admitted as exhibits at trial. Husband testified that the income he received from the Inherited Property and deposited into the parties' joint bank account had exceeded the expenses that he had paid from the joint account.

Concerning her contribution as to the Inherited Property, Wife testified that she and Husband went to the farm and performed whatever work was necessary, including cleaning the property and mending fences. Wife testified that she had meetings and worked with a company to set up the website for the trailer park. Additionally, Wife testified that she had collected rent from the tenants on the Inherited Property on some occasions but that most of the time, she and Husband went together to collect the rent. Wife testified that when she collected rent, she typically did not have the receipt book and that Husband would give the tenants a receipt at a later time. Husband testified that sometimes he had the receipt book with him but most of the time it was in the parties' kitchen. According to Husband, he instructed Wife several times to write the receipts when she took money for rent but she told him: "I would rather you do it. It's your deal. You can keep up with it better. You take care of it." The Trial Court found that Wife had only provided three receipts with her signature.

Wife also presented a business card for Black Oak Trailer Park that listed both Husband and Wife as "PARK OWNER." According to Wife, Husband had developed the business cards, and they were given out to promote the trailer park. Husband acknowledged developing the business card and passing it out to individuals. However, he testified that he "wasn't trying to convey [or] transfer property when [he] put her name on it." According to Husband, he was "just trying to appease her" but stated that putting her name on the business card was not something she had requested.

The Trial Court conducted a trial over five nonconsecutive days in February, March, and April of 2019. The witnesses at trial were Wife, Husband, and Harold Anthony Gregg, a real estate appraiser. The Trial Court subsequently entered a final divorce judgment, which incorporated its memorandum opinion as the findings of fact and conclusions of law of the Trial Court. The memorandum opinion and an asset list were both attached to the Trial Court's final judgment. In its order and opinion, the Trial Court found that the Genworth investment account was marital property and subject to division as such. The Trial Court classified the Inherited Property as Husband's separate property after finding

that there had been no comingling with marital property or transmutation. According to the Trial Court, any appreciation of value concerning the Inherited Property was market-driven solely. Additionally, the Trial Court found that the value of the log cabin at the time of the parties' marriage was Husband's separate property but that the increase in value since the marriage was marital property subject to division. The Trial Court also awarded Husband his attorney's fees for four of the five days of trial. Wife timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Wife raises the following issues for our review on appeal: (1) whether the Trial Court erred by classifying the Residence where the parties resided during the marriage as Husband's separate property; (2) whether the Trial Court erred by classifying the Inherited Property, including the farm, the Stone House, and the trailer park, as Husband's separate property; (3) whether the Trial Court erred by classifying the Genworth investment account in Wife's name as marital property; (4) whether reclassification of those assets requires modification of the distribution of marital assets; and (5) whether the Trial Court erred by awarding to Husband his reasonable attorney's fees for four of the five days of trial as a sanction against Wife.

As a threshold issue, we first address Wife's failure to include a property table in her appellant's brief. Tennessee Court of Appeals Rule 7 provides as follows:

> (a) In any domestic relations appeal in which either party takes issue with the classification of property or debt or with the manner in which the trial court divided or allocated the marital property or debt, the brief of the party raising the issue shall contain, in the statement of facts or in an appendix, a table in a form substantially similar to the form attached hereto. This table shall list all property and debts considered by the trial court, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts.

> (b) Each entry in the table must include a citation to the record where each party's evidence regarding the classification or valuation of the property or debt can be found and a citation to the record where the trial court's decision regarding the classification, valuation, division, or allocation of the property or debt can be found.

> (c) If counsel disagrees with any entry in the opposing counsel's table, counsel must include in his or her brief, or in a reply brief if the issue was raised by opposing counsel after counsel filed his or her initial brief, a similar table containing counsel's version of the facts.

Rule 7 also includes a sample format for a Rule 7 table.

However, as Husband points out in footnote 4 of his responsive appellate brief, Wife has not provided a table with citations to the record concerning the valuation, classification, and division of property, pursuant to Court of Appeals Rule 7. The only property table Wife included in her appellant's brief is a proposed equitable distribution of the marital property in the event this Court reverses the Trial Court's classification of property. Husband, therefore, states that because Wife did not provide a Rule 7 table, he "cannot submit a counter to it."

In her reply brief, Wife attached a table developed by the Trial Court, which did not include citations to the record or the parties' respective valuations of the property items. Wife stated as follows in her reply brief concerning Rule 7:

> [I]t is the position of the Appellant that if the Court of Appeals reverses the trial court as to the classification of the real property as argued by the Appellant then a remand will be necessary to determine an equitable division as to all assets. Because the trial court did not properly include all assets in the division of assets it is currently impossible for the Appellant to identify any errors as to the equitable division for purposes of Rule 7 table. A copy of the table utilized by the trial court is attached to this Brief as Appendix A. If this Court does not reverse the classification of separate property interests then the Appellant does not contest the division of property set forth in the table of the trial court.

Wife then provided a limited table in her reply brief which included only the Residence, the Genworth account, and Husband's Inherited Property. For each of those pieces of property, Wife included the Trial Court's valuation of the property, to whom the property was awarded, and citations to the record. This limited table did not include the parties' respective valuations of the property or citations to the record thereof or any other assets or debts of the parties.

Wife appears to make the argument that a full Rule 7 Table was not necessary because a remand would "be necessary to determine an equitable division as to all assets" if this Court reversed the Trial Court's classification of any item. We disagree. Rule 7 specifically requires a property table anytime a party on appeal "takes issue with the classification of property or debt," as well as the distribution of marital property or debt. A litigant may not pick and choose which appellate rules to comply with during an appeal.

A Rule 7 table is especially important because, in the final analysis, what we are concerned with as to property division is the overall division of the entire marital estate and whether that overall division is equitable. Although Wife has claimed no error with

- 6 -

the classification of the property excluded from her limited table, should this Court reverse the classification of the separate property at issue, that property necessarily would have to be redistributed as part of the marital estate. Consequently, Rule 7 requires a party who wishes to appeal the classification of property to include in his or her table "all property and debts considered by the trial court, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts." Wife did not do so in this case. Wife's decision to ignore the requirement of a Rule 7 table and include in her reply brief a limited table of only the property at issue is not sufficient to comply with Rule 7.

This Court has held that an appellant's failure to comply with Rule 7 can result in the appellant's waiver of all issues relating to the rule's requirements, which include classification of property and the distribution of marital property. *Harden v. Harden*, No. M2009-01302-COA-R3-CV, 2010 WL 2612688, at *8 (Tenn. Ct. App. June 30, 2010). Nonetheless, despite the deficiencies in Wife's Rule 7 table, we will attempt to "soldier on" to address the merits of Wife's appeal. *See Carter v. Browne*, No. W2018-00429-COA-R3-CV, 2019 WL 424201, at *8 (Tenn. Ct. App. Feb. 4, 2019) (exercising its discretion to consider the merits of the appeal despite an appellant's failure to comply with Rule 7 to consider the narrow issue of the classification of property); *see also In re Jada C.H.*, No. W2011-02542-COA-R3-JV, 2012 WL 4086120, at *6 (Tenn. Ct. App. Sept. 18, 2012) ("This Court has previously held that it may choose to 'soldier on' to decide the merits of a case when either the trial court or parties fail to follow the rules of this Court." (internal citations omitted)).

Wife has raised issues concerning the classification of several items of property. The classification of property during a divorce proceeding as either marital or separate property is a question of fact to be determined by the trial court upon consideration of all relevant circumstances. *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 245 (Tenn. 2009). We review questions of fact de novo upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). A trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Kelly*, 445 S.W.3d at 692. A trial court has wide discretion when classifying and dividing the marital estate, and its findings are entitled to great weight on appeal. *Sullivan v. Sullivan*, 107 S.W.3d 507, 512 (Tenn. Ct. App. 2002). Therefore, unless a trial court's decision concerning the classification or division of property is contrary to the preponderance of the evidence or is based on an error in law, we will not interfere with the trial court's decision on appeal. *Id.*

Furthermore, as our Supreme Court has instructed:

When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the

opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

The division of the parties' property begins with the identification and classification of all property interests. *Keyt v. Keyt*, 244 S.W.3d 321, 328 (Tenn. 2007). All property should be classified as either marital or separate property prior to distribution of the marital estate because the trial court does not have the authority to make an equitable distribution of separate property. *Id.* Generally, unless proven otherwise, property acquired by either spouse during the marriage is presumed to be marital property, while property acquired by either party prior to the marriage is presumed to be separate property. *Trezevant v. Trezevant*, 568 S.W.3d 595, 615 (Tenn. Ct. App. 2018), *perm. app. denied* (Tenn. Sept. 18, 2018); *Owens v. Owens*, 241 S.W.3d 478, 485 (Tenn. Ct. App. 2007). If a spouse seeks to have the other spouse's separate property classified as marital property, he or she bears the burden of proving that such property has become marital property as defined in Tennessee Code Annotated § 36-4-121(b)(1). *Keyt*, 244 S.W.3d at 328. Similarly, a spouse seeking to have property acquired during the marriage deemed as separate property has the burden of proving the asset is separate property, which can be proven by the types of evidence found in Tennessee Code Annotated § 36-4-121(b)(2)(B)-(F). *Owens*, 241 S.W.3d at 485-86.

Courts must look to Tennessee Code Annotated § 36-4-121 when classifying property as marital or separate. Tennessee Code Annotated § 36-4-121(b) (2017) provides in pertinent part as follows:

(1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date. . . .

(B)(i) "Marital property" includes income from, and any increase in the value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation;

(ii) "Marital property" includes the value of vested and unvested pension benefits, vested and unvested stock option rights, retirement, and other fringe benefit rights accrued as a result of employment during the marriage;

(iii) The account balance, accrued benefit, or other value of vested and unvested pension benefits, vested and unvested stock option rights, retirement, and other fringe benefits accrued as a result of employment prior to the marriage, together with the appreciation of the value, shall be "separate property." In determining appreciation for purposes of this subdivision (b)(1)(B)(iii), the court shall utilize any reasonable method of accounting to attribute postmarital appreciation to the value of the premarital benefits, even though contributions have been made to the account or accounts during the marriage, and even though the contributions have appreciated in value during the marriage; provided, however, the contributions made during the marriage, if made as a result of employment during the marriage and the appreciation attributable to these contributions, would be "marital property." When determining appreciation pursuant to this subdivision (b)(1)(B)(iii), the concepts of commingling and transmutation shall not apply;

(iv) Any withdrawals from assets described in subdivision (b)(1)(B)(iii) used to acquire separate assets of the employee spouse shall be deemed to have come from the separate portion of the account, up to the total of the separate portion. Any withdrawals from assets described in subdivision (b)(1)(B)(iii) used to acquire marital assets shall be deemed to have come from the marital portion of the account, up to the total of the marital portion;

* * *

(D) As used in this subsection (b), "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine;

* * *

(2) "Separate property" means:

(A) All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986 (26 U.S.C.), as amended;

(B) Property acquired in exchange for property acquired before the marriage;

(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1); [and]

(D) Property acquired by a spouse at any time by gift, bequest, devise or descent . . . .

(Footnote omitted).

Our Supreme Court discussed the concepts of marital property and separate property in *Langschmidt v. Langschmidt* and noted that in addition to the statutory provisions contained in Tennessee Code Annotated § 36-4-121(b), Tennessee intermediate appellate courts have recognized two methods by which separate property may be converted into marital property. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002). These two methods are commingling and transmutation, which the Supreme Court noted have been described by this Court as follows:

[S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur. . . . [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. . . . The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Langschmidt*, 81 S.W.3d at 747 (internal citations omitted).

The four most common factors courts use to determine whether transmutation of real property has occurred are as follows: "(1) the use of the property as a marital residence; (2) the ongoing maintenance and management of the property by both parties;

(3) placing the title to the property in joint ownership; and (4) using the credit of the non-owner spouse to improve the property." *Luplow v. Luplow*, 450 S.W.3d 105, 114 (Tenn. Ct. App. 2014) (quoting *Fox v. Fox*, No. M2004-02616-COA-R3-CV, 2006 WL 2535407, at *5 (Tenn. Ct. App. Sept. 1, 2006)).

We will address the classification of each piece of property in which Wife is challenging on appeal in turn. First, we address the Trial Court's classification of the Genworth investment account, valued at $41,248.70 at the time of trial, as marital property. The Trial Court found that Wife's separate funds in the Genworth account had been comingled with marital assets to such an extent that the original funds could not be traced to the original source.

The original funds in the Genworth account were from the sale of Wife's business in Mexico prior to the marriage. When Wife sold her business, the funds were placed into a bank account in Mexico in Wife's sole name. Wife's testimony concerning when the money was transferred from Mexico to the United States was inconsistent, but the Trial Court ultimately found that the funds were brought to the United States and placed in the money market sub-account of the parties' joint bank account in 2004. Wife did not present documentary evidence demonstrating the transfer of the money from the Mexican bank to show either the joint checking account or her separate account as the recipient bank. Additionally, Wife did not present evidence demonstrating the transfer of funds to the Genworth account proving from which account the funds originated. Without evidence proving otherwise and the Trial Court's finding that Wife's testimony was not credible, we cannot conclude that the Trial Court erred by finding that Wife's funds from the Mexican bank were deposited into the money market subaccount of the parties' joint checking account in 2004.

As the Trial Court found, Wife's original deposit into the account was in the amount of $34,355.65. Although Wife testified during trial that the money remained in the account untouched, the Trial Court found that money was withdrawn from that subaccount and deposited into other subaccounts frequently and that money had been added to that account during the marriage. The Trial Court explained as follows concerning the activity in the relevant subaccount:

> In January of 2006, for example, a thousand dollars was deposited into the money market account, $3,500 was withdrawn from the parties' money market account. In February, another thousand dollars was withdrawn from the money market account. In March, $5,082.08 was deposited into the same money market sub-account, $1,100 was withdrawn, another $1,585.70 was deposited, and then another deposit happened of $4,819.53. In April of that year, a total of $6,000 was withdrawn from the account. And this continues on. By September of 2006, there had been enough withdrawals from the

- 11 -

money market account that the balance was down to $8,327.68. By December of [2007], enough deposits had been made into that money market sub-account that the balance was back up to $22,000. By December of 2008, the balance was down to $14,092.91. But by November of 2009, enough deposits had been made that now the balance of that money market account is up to $41,248.70.

Following its analysis of the bank statements presented during trial, the Trial Court found that the parties were withdrawing funds from the account and depositing money into that account throughout the marriage to such an extent that it had become comingled with the marital estate. According to the Trial Court, the original funds from Wife's sale of her business account could no longer be traced in the account. Wife subsequently removed the funds from the subaccount of the parties' joint checking account in 2011 and 2012 and placed the funds into the Genworth investment account, where it was at the time of trial. The Trial Court found, however, that Wife's original funds already had been comingled at that point.

"Commingling does not occur if the separate property can be traced into its product or if the separate property continues to be segregated." *Eldridge v. Eldridge*, 137 S.W.3d 1, 14 (Tenn. Ct. App. 2002). However, in this case, money was taken out of the account and marital money was placed into the account throughout the marriage to such an extent that the money could no longer be traced back to the original funds. The preponderance of the evidence is not otherwise as to the Trial Court's finding that the funds in the ORNL money market subaccount, which were subsequently transferred to the Genworth account, were comingled. Due to the comingling, we affirm the Trial Court's classification of the Genworth account as marital property.

Wife also challenges the classifications of the Inherited Property, which included the Stone House, the farm, and the trailer park. Husband had inherited this property during the marriage. The Trial Court recognized that there was a will contest action that resulted in Husband's inheritance of this property. This will contest had resulted in Husband expending significant marital funds to pursue litigation involving the Inherited Property. Husband testified that he had paid back into the joint checking account the amount of legal fees from the will contest. Husband was not asked how or if he would have paid back these legal fees if he had been unsuccessful in the will contest. The Trial Court found that the litigation fees for the will contest paid from the marital funds did not affect the classification of this property because Husband paid reimbursement to the marital account. As such, the Trial Court found that Husband had met his burden by showing that the property is inherited property, pursuant to section 36-4-121. The Trial Court found the Inherited Property to be Husband's separate property.

There is no dispute that Husband inherited the property during the marriage. Tennessee Code Annotated § 36-4-121(b)(2)(D) defines separate property, *inter alia*, as "[p]roperty acquired by a spouse at any time by gift, bequest, devise or descent . . . ."). However, Wife argues that the property was commingled with marital property or had been transmuted to marital property, such that the Inherited Property should be classified as marital property.

The Trial Court found that Wife had presented no proof to show the property was inextricably comingled. The Trial Court found that the money from the separate property going in and out of the joint account can be traced back to the property, such that comingling as to the Inherited Property did not occur. The Trial Court explained as follows:

> When you look at them in 2013, there was $21,800 of separate income from the rental property. In addition, there was $86,529 worth of timber sold that was from this separate piece of property. And the expenses paid out that year were only $24,385. That's what he claimed on his taxes. The next year there was $31,562 in income. The next year there was some $93,550 in income, which was the rental income plus the second cutting of timber. And again, these far exceed the expenses that are being claimed for these years. In total, for the years that we've mentioned, these six years that this property was in their possession, there was $223,247 of income. The expenses that were paid out, that the Court acknowledges were paid out of a joint account, $189,920. So the income from his separate asset far exceeded the amount that was paid out. They are directly traceable back to his source of income as this rental income. With the receipts that were provided to the Court, I can directly trace them back to the separate asset.

The Trial Court, therefore, found that the Inherited Property had not been comingled with marital property to such an extent that the money used as expenses for the Inherited Property could not be traced back to the original separate property. The evidence presented does not preponderate against this finding by the Trial Court.

Concerning transmutation, the Trial Court found that the Inherited Property was never used as a marital residence, that Wife's name was not added to the deeds on the property, and that Wife's credit had not been used to improve the property. In its analysis of whether transmutation occurred, the Trial Court identified the factor in dispute concerning transmutation was the contributions made by Wife in the management and maintenance of the Inherited Property. Wife argued that she had substantially contributed to the maintenance and upkeep of the properties. However, the Trial Court found that she did not. Wife testified that she had collected rent and assisted Husband with the upkeep of the Inherited Property. The Trial Court, however, pointed out that when asked to identify

her contributions in collecting rents, she was only able to provide three receipts over the six years that Husband owned the property. The Trial Court found that Wife's contributions to the property were not substantial.

The attorney's fees required to succeed in the will contest litigation amounted to approximately $80,000, which Husband testified that he had paid back with the first sale of timber from the farm. We are left to wonder how or if Husband would have paid back this $80,000 of marital funds if he had been unsuccessful in the will contest. The Trial Court found that the taxes, insurance, and other expenses had been paid concerning the Inherited Property, and it is undisputed that these expenses were paid from the parties' joint checking account. However, the Trial Court also found that the Inherited Property had generated income that had been deposited into the joint checking account and that the amount of income placed into the joint checking account totaled more than the expenses that were paid from the account. According to the Trial Court, "[t]he income that was earned by the rental income far exceeded any of the expenses that were paid to upkeep, pay the insurance, [and] pay the taxes," and the money for the expenses could be traced back to its original source. As such, the Trial Court found that the parties had not treated the Inherited Property in a way to evidence an intention that it become marital property. The evidence presented during trial does not preponderate against the Trial Court's finding in this regard, and we find no error by the Trial Court classifying the Inherited Property as Husband's separate property.

Wife also challenges on appeal the Trial Court's classification of the pre-marital value of the Residence, where the parties lived throughout their marriage, as Husband's separate property. The Trial Court found that the appreciation of value of the Residence was marital property and subject to division. Husband's family had transferred the land to him by deed, and Husband built the Residence on the property in 1984. The parties were not married until 1997. During the marriage, the parties made significant improvements to the Residence. The improvements made to the Residence were funded with marital funds from the parties' joint bank account. Husband never placed Wife's name on the deed to the property. An appraisal valued the Residence at $94,800 in 1997 when the parties were married and at $160,700 in 2018 at the time of the pending divorce litigation. The appreciation in value during the marriage was $65,900. There was no mortgage on the Residence during the time of the marriage. The parties paid the utility bills, insurance premiums, and property taxes from the parties' joint checking account. The Trial Court found that Wife had substantially contributed to the appreciation of the value of the Residence and that, therefore, the appreciation amount was considered marital property. The Trial Court awarded half the amount of appreciation to Wife. The Trial Court, however, found that the value of the Residence as shown by the appraisal from 1997 remained Husband's separate property.

Wife argues that the Trial Court erred by not classifying the entire Residence as marital property through the theory of transmutation. However, "[a] residence should not be classified as marital property simply because the parties have lived in it." *Fox v. Fox*, No. M2004-02616-COA-R3-CV, 2006 WL 2535407, at *5 (Tenn. Ct. App. Sept. 1, 2006). Because the Residence was obtained by Husband as a gift of the land and his building of the log house prior to the parties' marriage, there is a presumption that it is Husband's separate property. *See id*. Wife had contributed to the appreciation of the home, as the Trial Court found, by the significant improvements to the Residence throughout the marriage. There was no mortgage on the home during the marriage, and Wife's name was never added to the deed on the home. The evidence presented during trial does not preponderate against the Trial Court's finding that the Residence is Husband's separate property but that the appreciation of the value of the Residence is marital property subject to division with the marital estate. We, therefore, affirm the Trial Court's classification of the Residence.

We next address Wife's argument that the Trial Court erred by awarding Husband his attorney's fees for four of the five days of trial. The Trial Court provides no specific authority for its award of attorney's fees. The Trial Court stated that an award of attorney's fees is "solely at the discretion of the Court" then proceeded to express its dissatisfaction with Wife's actions before and during trial. Specifically, the Trial Court identified its "biggest issue" was that Wife had no legal basis to argue that the classification of Husband's inherited property changed due to the will contest, which had caused an unreasonable delay resulting in additional trial days, testimony, and cross-examination on the issue. While Wife's position was not accepted by either the Trial Court or this Court, we cannot say there was no legal basis for her position given the initial expenditure of marital funds in the will contest along with the loose handling of income and expenses related to this property. As already noted in this Opinion, the Trial Court found that Husband paid back from income he received from the inherited property the $80,000 of marital funds spent in the will contest. The evidence does not preponderate against this finding. We are left with nothing in the record showing how or if Husband would have paid back this $80,000 if he had not been successful in the will contest. While it is tempting to speculate whether Husband could or would have paid back the $80,000 if he had been unsuccessful in the will contest, such speculation by this Court would be improper. The Trial Court further stated its problem with Wife changing her testimony after her deposition concerning when the money previously located in Mexico had been moved to a bank account in the United States causing additional unnecessary delay. The Trial Court, therefore, awarded attorney's fees to Husband for four of the five days of trial that the Trial Court determined "were as a result of the unreasonable arguments of [Wife]."

In *Cracker Barrel Old Country Store, Inc. v. Epperson*, our Supreme Court explained the American Rule:

Tennessee, like most jurisdictions, adheres to the "American rule" for award of attorney fees. *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998); *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985). Under the American rule, a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case. *Taylor* [*v. Fezell*], 158 S.W.3d [352,] 359 [(Tenn. 2005)]; *John Kohl*, 977 S.W.2d at 534.

*Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (footnote omitted). A trial court's award or denial of attorney's fees are reviewed under an abuse of discretion standard. *Hunt-Carden v. Carden*, No. E2018-00175-COA-R3-CV, 2020 WL 1026263, at *5 (Tenn. Ct. App. Mar. 3, 2020).

Although a party can be awarded attorney's fees as an award of alimony *in solido* in a divorce action, the Trial Court stated nothing with regard to an award of alimony to Husband and did not make findings relevant to such an award to Husband. There also was no contract in this case providing for an award of attorney's fees. Furthermore, Tennessee Rule of Civil Procedure 11 allows an award of attorney's fees as a sanction when the trial court finds that a party has presented a pleading, written motion, or other document to the court for "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." *See* Tenn. R. App. P. 11.02; *Fossett v. Gray*, 173 S.W.3d 742, 752 (Tenn. Ct. App. 2004). However, in that circumstance, sanctions can be imposed only after the party or attorney is provided with notice and a reasonable opportunity to respond. *See* Tenn. R. Civ. P. 11.03.

A similar case, *Fossett v. Gray,* involved an award of attorney's fees based on "additional litigation time" for issues already litigated and "unduly delay." *Fossett*, 173 S.W.3d at 752. This Court determined in *Fossett* that the trial court had no authority to award attorney's fees as a sanction other than Tennessee Rule of Civil Procedure 11 and that the trial court had not followed proper procedure for Rule 11 sanctions.

Similarly*,* the Trial Court in this case does not specifically refer to Rule 11 as its authority for imposition of the award of attorney's fees, only that it was at the Trial Court's discretion and that Wife had caused an unreasonable delay due to her unfounded arguments and contradictory testimony. We note that the Trial Court's reasoning for its award of attorney's fees is similar to the language in Rule 11 allowing sanctions when the parties' filings are for an improper purpose such as "to cause unnecessary delay or needless increase in the cost of litigation." However, the Trial Court did not provide Wife with notice and an opportunity to respond to any allegation of such by following the procedure set forth in Rule 11.03 prior to the award of attorney's fees. Determining that the Trial Court did not

have a legal basis upon which to award attorney's fees in this matter as they were neither alimony nor appropriate sanctions under Rule 11, we reverse the Trial Court's award of attorney's fees to Husband.

### Conclusion

For the foregoing reasons, we reverse the award of attorney's fees to Husband and affirm the Trial Court's judgment in all other respects. This cause is remanded to the Trial Court for collection of costs assessed below. The costs on appeal are assessed one-half against the appellant, Judith Galilea Abner, and her surety, if any, and one-half against the appellee, Steven Dale Abner, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE